# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANTHONY BANKS**
3973 Albers Pointe Dr.
Florissant, MO 63034

~and~

**MARGORIE H. BATES AS ADMINISTRATRIX AND**
**PERSONAL REPRESENTATIVE OF**
**THE ESTATE OF THOMAS C. BATES JR.**
3503 Lawson Road
Aiken, SC 29801

~and~

**MONTY BATES**
PO Box 243
Aiken, SC 29801

~and~

**THOMAS C. BATES JR.**
913 Shadow Dr
Aiken, SC 29801

~and~

**REBECCA BOWLER AS ADMINISTRATRIX AND**
**PERSONAL REPRESENTATIVE OF**
**THE ESTATE OF HAROLD GHUMM**
3271 N State Highway AB
Springfield, MO 65803

~and~

**REBECCA BOWLER**
3271 N State Highway AB
Springfield, MO 65803

~and~

**MELIA W. COLLIER AS ADMINISTRATRIX AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF WILLIAM E. WINTER**
28193 Washington Road
Athen, AL 35613

~and~

**MELIA W. COLLIER**
28193 Washington Road
Athen, AL 35613

~and~

**MICHAEL E. WINTER**
2341 Black Creek Crossing
Hoover, AL 35244

~and~

**ALAN TRACY COPELAND**
7199 Johns Pointe Court
Liberty, NC 27298

~and~

**CHARLES M. FRYE**
9562 Monterra Way
Buena Park, CA 9062

~and~

**THOMAS F. HOLBERTON**
108 Parkview Dr. Apt 201
Bridgeport, WV 26330

~and~

**ELIZABETH G. HOUSE AS ADMINISTRATRIX AND
PERSONAL REPRESENTATIVE OF
THE ESTATES PAUL D. LYON JR AND FRANCISCO LYON**
6251 Saragon Lane
Milton, FL 32583

~and~

2

**ELIZABETH G. HOUSE**
6251 Saragon Lane
Milton, FL 32583

~and~

**EARL D. LYON**
401 Seamarge Lane
Pensacola, FL 32507

~and~

**VALERIE LYON AS ADMINISTRATRIX AND**
**PERSONAL REPRESENTATIVE OF**
**THE ESTATES OF MARIA AND PAUL D. LYON**
5617 Lia Drive
Milton, FL 32570

~and~

**VALERIE LYON**
5617 Lia Drive
Milton, FL 32570

~and~

**LISA H. HUDSON AS ADMINISTRATRIX AND**
**PERSONAL REPRESENTATIVE OF**
**THE ESTATE OF JOHN R. HUDSON**
14 Ocean Park Loop
Georgetown, SC 29440

~and~

**LISA H. HUDSON**
14 Ocean Park Loop
Georgetown, SC 29440

~and~

**WILLIAM HUDSON**
1190 North Highland Ave No. 8338
Atlanta, GA 30306

~and~

**JOSEPH JACOBS**
5353 Alton Drive
Virginia Beach, VA 23464

~and~

**STEPHEN M. JENKINS AS ADMINISTRATRIX AND**
**PERSONAL REPRESENTATIVE OF**
**THE ESTATES OF NATHANIEL H. JENKINS AND NATHALIE JENKINS**
PO Box 730096
Ormond Beach, FL 32173

~and~

**STEPHEN M. JENKINS**
PO Box 730096
Ormond Beach, FL 32173

~and~

**RACHEL CALDERA AS ADMINISTRATRIX AND**
**PERSONAL REPRESENTATIVE OF**
**THE ESTATES OF RANDALL GARCIA,**
**JESUS "JESS" GARCIA, AND VIOLET E. GARCIA**
42 Fairview Ave
Gustine, CA 95322

~and~

**RACHEL CALDERA**
42 Fairview Ave
Gustine, CA 95322

~and~

**REBECCA JEWETT**
2632 Capella Dr
Merced, CA 95341

~and~

**ROXANNE PRYOR**
7272 Central Ave
Winton, CA 95388

~and~

**BRIAN KIRKPATRICK**
123 Springfield Rd
Beaufort, SC 29907

~and~

**KRIS LAISE AS ADMINISTRATRIX AND**
**PERSONAL REPRESENTATIVE OF**
**THE ESTATE OF KEITH LAISE**
9897 Smokies Way
Findlay, OH 45840

~and~

**JAMES J. LANGON III AS ADMINISTRATRIX AND**
**PERSONAL REPRESENTATIVE OF**
**THE ESTATE OF JAMES J. LANGON IV**
1151 17th Avenue
Wall, NJ 07719

~and~

**JAMES J. LANGON**
1151 17th Avenue
Wall, NJ 00719

~and~

**MICHAEL E. MEURER AS ADMINISTRATRIX AND**
**PERSONAL REPRESENTATIVE OF**
**THE ESTATES OF RONALD MEURER,**
**JOHN MEURER, AND MARY LOU MEURER**
1006 Ash St
Louisville, KY 40217

~and~

**MICHAEL E. MEURER**
1006 Ash St
Louisville, KY 40217

~and~

**JOHN T. MEURER**
5906 North Ames Terrace

Glendale, WI 53209

~and~

**JAY T. MEURER**
3521 Lentz Ave
Louisville, KY 40215

~and~

**ROBIN LYNCH**
8511 Claudia Drive
Louisville, KY 40219

~and~

**GREGORY MENKINS**
PO Box 214
Rosepine, LA 70659

~and~

**PHILIECE R. MILLS**
9631 Ramon Valley Ave
Las Vegas, NV 89149

~and~

**STEVEN T. OWENS**
5210 Old Stage Rd
Lawrenceville, VA 23868

~and~

**SUSAN RAY AS ADMINISTRATRIX AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOSEPH MOORE**
4705 Candice Drive
St. Louis, MO 63123

~and~

**SUSAN RAY**
4705 Candice Drive
St. Louis, MO 63123

~and~

**VANESSA RICHARDSON AS ADMINISTRATRIX AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF WARREN RICHARDSON**
170-34 170 Avenue Apt 13B
Jamaica, NY 11434

~and~

**VANESSA RICHARDSON**
170-34 170 Avenue Apt 13B
Jamaica, NY 11434

~and~

**SAMUEL SCOTT SCIALABBA AS ADMINISTRATRIX AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF PETER SCIALABBA**
113 Stuart Ave
Emerald Isle, NC 28594

~and~

**SAMUEL SCOTT SCIALABBA**
113 Stuart Ave
Emerald Isle, NC 28594

~and~

**JACQUELYN SCIALABBA**
601 Pelletier Loop Rd Unit I53
Swansboro, NC 28584

~and~

**DONNA SMITH AS ADMINISTRATRIX AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF DONALD H. VALLONE JR. AND DONNA J. PHELPS**
37317 Cedrela Avenue
Palm Dale, CA 93552

~and~

**DONNA SMITH**
37317 Cedrela Avenue

Palm Dale, CA 93552

~and~

**MICHAEL TOMA**
922 Shaded Water Way
Lutz, FL 33549

~and~

**DARRIN WIGGLESWORTH**
1009 Quail Roost Way
Myrtle Beach, SC 29588

~and~

**MARK WIGGLESWORTH**
80 Canterbury Court
Goshen, CT 06756

~and~

**ROBYN WIGGLESWORTH**
38227 Hazelwood St
Murrieta, CA 92562

~and~

**SHAWN WIGGLESWORTH**
2612 Henagan lane
Myrtle Beach, SC 29588

~and~

**THOMAS D. YOUNG**
212 NE 59th St
Oak Island, NC 28465

~and~

**JOHN W. YOUNG**
84 Westbrook Dr
Moorestown, NJ 08057

**Case No:**

**v.**

**THE ROTHENBERG LAW FIRM, LLP**
706 Salem Court
Yardley, PA 19067

~and~

**THE ROTHENBERG LAW FIRM, LLP**
**d/b/a THE ROTHENBERG LAW FIRM ACCIDENT**
**AND INJURY LAWYERS**
706 Salem Court
Yardley, P.A. 19067

~and~

**ALLEN L. ROTHENBERG, ESQ.**
1420 Walnut Street, 2nd Floor
Philadelphia, PA 19102

## CLASS ACTION PETITION FOR DECLARATORY JUDGMENT

***COME NOW*** Plaintiffs, by and through undersigned counsel, and respectfully submit to this Honorable Court this Petition for Declaratory Judgment. In support thereof, Plaintiffs state the following:

### JURISDICTION & VENUE

1.      This matter is brought before the Court pursuant to Rules 23 and 57 of the Federal Rules of Civil Procedure and established pursuant to 28 U.S.C. §2201.

2.      Jurisdiction is invoked against Defendants pursuant to 28 U.S.C. §1346 by virtue of the fact that all acts occurred within the jurisdiction of this Court and by virtue of the fact that all Defendants have purposefully availed themselves of this jurisdiction by establishing at least minimum contacts herein.

3.      Further, jurisdiction is also based upon 28 U.S.C. §1332 and the amount in controversy that is subject to the conduct in question exceeds $75,000.

4.      Venue is proper in this district under 28 U.S.C. §1391, including but not limited §1391(b)(2)

5.      This action pertains to the nature and scope of a Retainer Agreement entered into between the parties and controlled under the law of the District of Columbia and the representation of the Plaintiffs thereunder.

6.      The nature and scope of the Retainer Agreement resulted in the filing of *Peterson v. Islamic Republic of Iran*, 01-CV-294 RCL, as well as *Bonk v. Islamic Republic of Iran, et al.*, 08-CV-1273, which was consolidated into *Valore v. Islamic Republic of Iran*, 03-CV-1959. For simplification, throughout this Petition, all such parties to these cases will be collectively referred to as the "*Peterson* clients" and the case as the "*Peterson* case" unless expressly distinguished form one another. Because this matter involves the *Peterson* case, it has been identified as a related case on the civil information form.

7.      To the extent Defendants in fact entered into Retainer Agreements it was with full knowledge and acceptance of the jurisdiction and venue to be that of the District of Columbia in 2001.

**PARTIES**

8.      Plaintiff Anthony Banks is and, at all times relevant hereto, was an adult resident of the State of Missouri.

9.      Plaintiff Margorie H. Bates is and, at all times relevant hereto, was an adult resident of the State of South Carolina.

10.      Margorie H. Bates is and, at all times relevant hereto, was the personal representative and administratrix of the Estate of Thomas C. Bates Sr.

11.     Plaintiff Thomas C. Bates Sr. is and, at all times relevant hereto, was an adult resident of the State of South Carolina and died on November 26, 2022.

12.     Plaintiff Monty Bates is and, at all times relevant hereto, was an adult resident of the State of South Carolina.

13.     Plaintiff Thomas C. Bates Jr. is and, at all times relevant hereto, was an adult resident of the State of South Carolina.

14.     Plaintiffs Thomas C. Bates Jr. and Monty Bates are brothers; Plaintiff Margorie H. Bates is their mother.

15.     Plaintiff Rebecca Bowler is and, at all times relevant hereto, was an adult resident of the State of Missouri.

16.     Rebecca Bowler is and, at all times relevant hereto, was the personal representative and administratrix of the Estate of Harold Ghumm.

17.     Harold Ghumm, at all times relevant hereto, was an adult resident of the State of North Carolina and passed away on October 23, 1983.

18.     Plaintiff Rebecca Bowler is the sister of Harold Ghumm.

19.     Plaintiff Melia W. Collier is and, at all times relevant hereto, was an adult resident of the State of Alabama.

20.     Melia W. Collier is and, at all times relevant hereto, was the personal representative and administratrix of the Estate of William E. Winter.

21.     Plaintiff William E. Winter is and, at all times relevant hereto, an adult resident of the State of Alabama and passed on October 23, 1983.

22.     Plaintiff Melia W. Collier is the widow of William E. Winter.

23. Plaintiff Michael E. Winter is and, at all times relevant hereto, was an adult resident of the State of Alabama

24. Plaintiffs Melia W. Collier is the mother of Michael E. Winter.

25. Plaintiff Alan Tracy Copeland is and, at all times relevant hereto, was an adult resident of the State of North Carolina.

26. Plaintiff Charles M. Frye is and, at all times relevant hereto, was an adult resident of the State of California.

27. Plaintiff Thomas F. Holberton is and, at all times relevant hereto, was an adult resident of the State of West Virginia

28. Plaintiff Elizabeth G. House is an, at all times relevant hereto, was an adult resident of the State of Florida.

29. Elizabeth G. House is and, at all times relevant hereto, was the personal representative and administratrix of the Estates of Paul D. Lyon Jr. And Francisco Lyon.

30. Plaintiff Paul D. Lyon Jr. is and, at all times relevant hereto, was an adult resident of the State of Florida and died on October 23, 1983.

31. Plaintiff Francisco Lyon is and, at all times relevant hereto, was an adult resident of the State of Florida and died on February 19, 2016.

32. Elizabeth G. House is the sister of Paul D. Lyon Jr. And Francisco Lyon.

33. Earl D. Lyon is and, at all times relevant hereto, was an adult resident of the State of Florida.

34. Plaintiff Valerie Lyon is and, at all times relevant hereto, was an adult resident of the State of Florida.

35.    Valerie Lyon is and, at all times relevant hereto, was the personal representative and administratrix of the Estates of Maria and Paul D. Lyon

36.    Plaintiff Maria Lyon is and, at all times relevant hereto, was an adult resident of the State of Florida and died on August 19, 2021.

37.    Plaintiff Paul D. Lyon is and, at all times relevant hereto, was an adult resident of the State of Florida and died on October 7, 2021.

38.    Elizabeth G. House, Earl D. Lyon, and Valerie Lyon are the children of Maria and Paul D. Lyon.

39.    Elizabeth G. House, Earl D. Lyon, and Valerie Lyon are siblings.

40.    Plaintiff Lisa H. Hudson is and, at all times relevant hereto, was an adult resident of the State of South Carolina.

41.    Lisa H. Hudson is and, at all times relevant hereto, was the personal representative and administratrix of the Estate of John R. Hudson.

42.    Plaintiff John R. Hudson is and, at all times relevant hereto, an adult resident of the State of Georgia and died on October 23, 1983.

43.    Lisa H. Hudson is the widow of John R. Hudson.

44.    Plaintiff William Hudson is and, at all times relevant hereto, was an adult resident of the State of Georgia.

45.    Lisa H. Hudson is the mother of William Hudson.

46.    Plaintiff Joseph Jacobs is and, at all times relevant hereto, was an adult resident of the Commonwealth of Virginia.

47.    Plaintiff Stephen M. Jenkins is and, at all times relevant hereto, was an adult resident of the State of Florida.

48.     Stephen M. Jenkins is and, at all times relevant hereto, was the personal representative and administratrix of the Estates of Nathaniel H. Jenkins and Nathalie Jenkins.

49.     Plaintiff Nathaniel H. Jenkins is and, at all times relevant hereto, was an adult resident of the State of Florida and died on October 23, 1983.

50.     Plaintiff Nathalie Jenkins is and, at all times relevant hereto, was an adult resident of the State of Florida and died on December 3, 2007

51.     Stephen M. Jenkins is the brother of Nathaniel H. Jenkins

52.     Stephen M. Jenkins is the son of Nathalie Jenkins.

53.     Plaintiff Rachel Caldera is and, at all times relevant hereto, was an adult resident of the State of Georgia.

54.     Rachel Caldera is and, at all times relevant hereto, was the personal representative and administratrix of the Estates of Randall Garcia, Jesus "Jess" Garcia, and Violet E. Garcia.

55.     Plaintiff Randall Garcia is and, at all times relevant hereto, was an adult resident of the State California of and died on October 23, 1983.

56.     Plaintiff Jesus "Jess" Garcia is and, at all times relevant hereto, was an adult resident of the State of California and died on August 23, 2014.

57.     Plaintiff Violet E. Garcia is and, at all times relevant hereto, was an adult resident of the State of California and died on October 15, 2022.

58.     Rachel Caldera is the sister of Randall Garcia.

59.     Rachel Caldera is the daughter of Jesus "Jess" Garcia.

60.     Rachel Caldera is the daughter of Violet E. Garcia.

61.     Plaintiff Rebecca Jewett is and, at all times relevant hereto, was an adult resident of the State of California

62.    Plaintiff Roxanne Pryor is and, at all times relevant hereto, was an adult resident of the State of California.

63.    Rachel Caldera, Rebecca Jewett, and Roxanne Pryor are sisters.

64.    Plaintiff Brian Kirkpatrick is and, at all times relevant hereto, was an adult resident of South Carolina.

65.    Plaintiff Kris Laise is and, at all times relevant hereto, was an adult resident of the State of Ohio.

66.    Kris Laise is and, at all times relevant hereto, was the personal representative and administratrix of the Estate of Keith Laise.

67.    Plaintiff Keith Laise is and, at all times relevant hereto, was an adult resident of the State of Pennsylvania and died on October 23, 1983.

68.    Kris Laise is the sister of Keith Laise.

69.    Plaintiff James J. Langon III is and, at all times relevant hereto, was an adult resident of the State of New Jersey.

70.    James J. Langon III is and, at all times relevant hereto, was the personal representative and administratrix of the Estate of James J. Langon IV.

71.    Plaintiff James J. Langon IV is and, at all times relevant hereto, was an adult resident of the State of New Jersey and died on October 23, 1983.

72.    James J. Langon III is the father of James J. Langon IV.

73.    Plaintiff Michael E. Meurer is and, at all times relevant hereto, was an adult resident of the State of Kentucky.

74.     Michael E. Meurer is and, at all times relevant hereto, was the personal representative and administratrix of the Estates of Ronald Meurer, John Meurer, and Mary Lou Meurer.

75.     Plaintiff Ronald Meurer is and, at all times relevant hereto, was an adult resident of the State of North Carolina and died on October 23, 1983.

76.     Plaintiff John Meurer is and, at all times relevant hereto, was an adult resident of the State of Kentucky and died on October 31, 2012.

77.     Plaintiff Mary Lou Meurer is and, at all times relevant hereto, was an adult resident of the State Kentucky of and died on February 27, 2008.

78.     Plaintiff John T. Meurer is and, at all times relevant hereto, was an adult resident of the State of Wisconsin.

79.     Plaintiff Jay T. Meurer is and, at all times relevant hereto, was an adult resident of the State of Kentucky.

80.     Michael E. Meurer, Ronald Meurer, John T. Meurer, and Jay T. Meurer are brothers.

81.     Plaintiff Robin Lynch is and, at all times relevant hereto, was an adult resident of the State of Kentucky.

82.     Michael E. Meurer, Ronald Meurer, John T. Meurer, Jay T. Meurer, and Robin Lynch are siblings.

83.     John Meurer and Mary Lou Meurer are the parents of Michael E. Meurer, Ronald Meurer, John T. Meurer, Jay T. Meurer, and Robin Lynch.

84.     Plaintiff Gregory Menkins is and, at all times relevant hereto, was an adult resident of the State of Louisiana.

85.     Plaintiff Philiece R. Mills is and, at all times relevant hereto, was an adult resident of the State of Neveda.

86.     Plaintiff Steven T. Owens is and, at all times relevant hereto, was an adult resident of the State of Virginia.

87.     Plaintiff Susan Ray is and, at all times relevant hereto, was an adult resident of the State of Missouri.

88.     Susan Ray is and, at all times relevant hereto, was the personal representative and administratrix of the Estate of Joseph Moore.

89.     Joseph Moore is and, at all times relevant hereto, was an adult resident of the State of Missouri and died on October 23, 1983.

90.     Susan Ray and Joseph Moore are siblings.

91.     Plaintiff Vanessa Richardson is and, at all times relevant hereto, was an adult resident of the State of New York.

92.     Vanessa Richardson is and, at all times relevant hereto, was the personal representative and administratrix of Warren Richardson.

93.     Plaintiff Warren Richardson is and, at all times relevant hereto, was an adult resident of the State of New York and died on October 23, 1983.

94.     Vanessa Richardson and Warren Richardson are siblings.

95.     Plaintiff Samuel Scott Scialabba is and, at all times relevant hereto, was an adult resident of North Carolina.

96.     Samuel Scott Scialabba is and, at all times relevant hereto, was the personal representative and administratrix of the Estate of Peter Scialabba.

97.    Plaintiff Peter Scialabba is and, at all times relevant hereto, was an adult resident of the State of North Carolina and died on October 23, 1983.

98.    Samuel Scott Scialabba is the son of Peter Scialabba.

99.    Plaintiff Jacqueline Scialabba is and, at all times relevant hereto, was and adult resident of North Carolina.

100.    Jacqueline Scialabba is the widow of Peter Scialabba and mother of Samuel Scott Scialabba.

101.    Plaintiff Donna Smith is and, at all times relevant hereto, was an adult resident of the State of California.

102.    Donna Smith is and, at all times relevant hereto, was the personal representative and administratrix of the Estates of Donald H. Vallone Jr. and Donna J. Phelps.

103.    Plaintiff Donald H. Vallone is and, at all times relevant hereto, was an adult resident of the State of California and died on October 23, 1983.

104.    Plaintiff Donna J. Phelps is and, at all times relevant hereto, was an adult resident of the State of California and died on April 29, 2021.

105.    Donna Smith is the sister of Donald H. Vallone Jr.

106.    Donna Smith is the daughter of Donna J. Phelps.

107.    Plaintiff Michael Toma is and, at all times relevant hereto, was an adult resident of the State of Florida.

108.    Plaintiff Darrin Wigglesworth is and, at all times relevant hereto, was an adult resident of the State of South Carolina.

109.    Plaintiff Mark Wigglesworth is and, at all times relevant hereto, was an adult resident of the State of Connecticut.

110.    Plaintiff Robyn Wigglesworth is and, at all times relevant hereto, was an adult resident of the State of California.

111.    Plaintiff Shawn Wigglesworth is and, at all times relevant hereto, was an adult resident of the State of South Carolina.

112.    Darrin Wigglesworth, Mark Wigglesworth, Robyn Wigglesworth, and Shawn Wigglesworth are brothers.

113.    Plaintiff Thomas D. Young is and, at all times relevant hereto, was an adult resident of the State of North Carolina.

114.    Plaintiff John W. Young is and, at all times relevant hereto, was an adult resident of the State of New Jersey.

115.    Defendant The Rothenberg Law Firm, LLP is and, at all times relevant hereto, was a limited liability partnership with a principal place of business in the Commonwealth of Pennsylvania and conducting business and holding itself out to represent individuals in the District of Columbia.

116.    Defendant The Rothenberg Law Firm, LLP d/b/a The Rothenberg Law Firm Injury and Accident Lawyers is and, at all times relevant hereto, was a fictitious name under which the Rothenberg Law Firm operated.

117.    Defendant Allen L. Rothenberg is and, at all times relevant hereto, was an attorney who resides in the Commonwealth of Pennsylvania with a principal place of business in the Commonwealth of Pennsylvania and barred to practice law in the District of Columbia.

118.    Defendants "The Rothenberg Law Firm, LLC," "The Rothenberg Law Firm, LLC d/b/a The Rothenberg Law Firm Injury and Accident Lawyers," "Allen Rothenberg," and their agents, servants, and/or employees are hereinafter collectively and jointly referred to as "Mr.

Rothenberg" or the "Rothenberg Defendants," except where expressly distinguished from one another.

## **STANDING**

119.    Plaintiffs have standing to seek declaratory relief because upon information and belief Defendants are claiming they are owed a fee from Plaintiffs.  That Retainer Agreement was terminable by express rights afforded to the Plaintiffs. Likewise, all Defendants have been utilizing an arbitration proceeding, which Plaintiffs are not a party to and which has an arbitration agreement that expressly preserves the Plaintiffs' rights. All Defendants have been inappropriately utilizing that arbitration proceeding to seek to obtain funds that are to be or have already been awarded to the Plaintiffs and that Plaintiffs have not consented to distribution to the Defendants.

120.    Plaintiffs have been and continue to be damaged and harmed by the conduct of the Defendants in the following ways:

   a.  Plaintiffs' sacred right to have privileged communications with their attorneys under the attorney-client privilege are being infringed upon by orders of the arbitrator and conduct of Defendants;

   b.  Plaintiffs' absolute right to choose who they hire and fire as their legal counsel is being infringed upon by orders of the arbitrator and conduct of Defendants;

   c.  Plaintiffs' due process rights to be a party to an adjudication of a fee dispute stemming from their own recoveries for personal injury damages is being infringed upon by orders of the arbitrator and conduct of Defendants;

   d.  Plaintiffs' due process rights to be able to recover disputed funds against a third-party creditor who claims to have an interest against Plaintiffs' damages recovery

are being infringed upon and have been eviscerated by orders of the arbitrator and

conduct of the Defendants; and

e.  Plaintiffs' sacred rights afforded to them to be represented by a loyal attorney who

owed them a fiduciary duty has been violated by the Defendants in so far as

Defendants have taken adversarial positions against them and prioritized their own

financial interest above Plaintiffs' interest.

121.    The conduct from which relief sought is redressable by the Court because a

favorable ruling vacating the arbitration orders would establish as a matter of law the clear

application of the Plaintiffs' rights vis-à-vis the Defendants, would completely terminate and end

all fee disputes at issue in the underlying arbitration action that affect the Plaintiffs' rights, and

would establish the proper procedure to advance a fee dispute between an attorney/law firm and

his/her/its former client.

## FACTUAL BACKGROUND COMMON TO ALL CLAIMS

122.    In the early 2000's, Plaintiffs each entered into their own individual Retainer

Agreements bearing the letterhead of "Law Offices of….Thomas Fortune Fay, Steven R. Perles,

Allen L. Rothenberg." See below:

## *LAW OFFICES OF*

**THOMAS FORTUNE FAY**
601 Pennsylvania Avenue.,N.W.
Suite 900-South Building
Washington, DC 20004
Tel. (202) 638-4534
Fax (202) 639-8238

**STEVEN R. PERLES**
1615 New Hampshire Avenue
Suite 200
Washington, DC 20004
Tel. (202) 745-1300
Fax (202) 745-1858

**ALLEN L. ROTHENBERG**
Rothenberg Tower
1518 Walnut Street
Philadelphia, PA 19102
Tel. (215) 732-1700
Fax (215) 732-2758

123.    These Plaintiffs were seeking representation for claims against Iran on behalf of either themselves or their family members who were Marines stationed in Beirut, Lebanon in October of 1983 when terrorists delivered a car bomb into their barracks.

124.    The destruction, carnage, death, and damages that these individuals sustained is/was beyond catastrophic.

125.    The scope of the Contingent Retainer Agreement was "to represent me in the prosecution and recovery or settlement of all claims and causes of action against The Islamic Republic of Iran and its agents."

126.    The contingency fee agreement indicated that "[t]his fee is contingent upon collection and to the extent of collection only."

127.    Each such Retainer Agreement was executed by the Plaintiffs, Mr. Fay, Mr. Perles, and Mr. Rothenberg.

128.    The Court is intimately familiar with the procedure of the *Peterson* case, and the docket and its filings are incorporated herein to this action; however, the following is also recited as an overview of the procedural history.

129.    The *Peterson* case was physically filed on September 11, 2001, but was docketed in October of 2001 due to technicalities arising from the terrorist attack on 9/11.

130.    Diplomatic service was effectuated on the defendants.

131.    Subsequent to service being effectuated, numerous clients were dismissed due to the fact that the Commonweal of Pennsylvania and the State of Luisiana had a presence requirement as an element to establish a cause of action for intentional infliction of emotional distress.

132.    Several Amended Complaints were filed seeking to add plaintiffs to the action.

133.    While many of the Amended Complaints were accepted by the Court, there came a point in time when the Court ruled that no more clients could be added to *Peterson* and any new parties seeking to recover against Iran for the October 23, 1983 terrorist attack would have to institute new actions. Those plaintiffs who were required to file new actions have come to be referred to in the litigation process as the "Follow On Plaintiffs."

134.    Eventually, default judgment was entered in the *Peterson* case, a special discovery master was appointed and issued damages reports, and each plaintiff received their own judgment against the Iranian government and its agents.

135.    The Follow On Plaintiffs obtained their judgments after the *Peterson* Clients.

136.    Despite having obtained a judgment against Iran, no attorneys' fees had been earned under the Retainer Agreement because no funds had been collected. Thus, collection efforts started.

137.    Upon information and belief to these Plaintiffs, Defendants have asserted in an arbitration proceeding that the extent of Mr. Rothenberg's contributions to the Plaintiffs case was solely tracking down and recruiting plaintiffs for the group to represent and covering his share of common expenses.

138.    Upon information and belief to these Plaintiffs, Mr. Rothenberg has testified that he ceased representing any of these plaintiffs by 2007, prior to the collection of any funds.

139.    While the *Peterson* action was pending before this Court, Mr. Rothenberg also began representing other victims of terrorist activities with co-counsel agreements with other firms that did not include Messrs. Fay and Perles.

140.    Upon information and belief to these Plaintiffs, those other cases have over time been referred to as *Greenbaum, Kirshenbaum, Acosta,* and *Beer*. (hereinafter referred to collectively as the "*Greenbaum*" Cases).

141. The *Greenbaum* Cases did not involve individuals who were victims of the October 23, 1983 terrorist attack on as the *Peterson* clients.

142. The *Greenbaum* Cases followed their own case dockets and also received judgments against Iran.

## COLLECTION EFFORTS

143. The United States of America Office of Foreign Assets Control ("OFAC") is a Department of the U.S. Treasury Department that enforces economic sanctions against foreign countries, individuals, and entities based on national security and foreign policy objectives.

144. When OFAC takes control of an asset, it categorizes them under different types of assets. For the purposes of recoveries under the Foreign Sovereign Immunities Act ("FSIA"), OFAC categorized assets as either 1) assets under the International Emergency Economic Powers Act ("IEEPA"); 2) assets that have been blocked under either standing or special OFAC Rules; or 3) assets connected with individuals on the Specially Designated Nationals List ("SDN List").

145. Subsequent to obtaining judgments in the *Peterson* case, Fay & Perles perfected the *Peterson* judgments and then filed a 28 U.S.C. §1610(c) in the District of Columbia, thus establishing the *Peterson* clients as "judgment creditors."

146. Under the FSIA, judgment creditors gain information related to various assets.

147. Bank Markazi is and, at the time, was the Central Bank of Iran.

148. From 1994 to 2008, Bank Markazi held bonds in an account with Clearstream, a Luxembourg-based financial services company. The principal and interest payments on the bonds were paid into a New York bank account held by Clearstream and then transferred to Bank Markazi's bank account.

149.    In 2008, Bank Markazi created an account with UBAE, an Italian bank, who then created an account with Clearstream.

150.    Clearstream then began transferring the payments on the bonds into UBAE's Clearstream account.

151.    OFAC identified these assets of the Bank Markazi being held in New York.

152.    Clearstream learned of allegations from OFAC that UBAE was holding the account for the purposes of obscuring Bank Markazi as the owner of the assets.

153.    Clearstream froze the accounts in America while continuing to conduct business in Italy with UBAE.

154.    These assets, however, were neither subject to an IEEPA, a blocked asset under the OFAC Rules, nor an asset connected with an individual on the SDN List.

155.    The U.S. Treasury Department did not know how to classify these assets and sought to utilize the *Peterson* action as a means to hold the funds.

156.    Fay & Perles was then made aware of the asset and filed a writ of attachment in New York.

157.    Fay & Perles then sought to recover the funds through a collection action against Bank Markazi. This action is known by all parties and referred to herein as the *Clearstream I* action.

158.    During the time period that the *Peterson* judgments were being perfected, Mr. Rothenberg hired his own collection attorneys led by Mr. Stroock.

159.    Upon information and belief to these Plaintiffs, Mr. Rothenberg has testified that he was the client and Mr. Stroock was the attorney who Mr. Rothenberg hired to collect on the *Greenbaum* Cases' judgments.

160.    Mr. Stroock filed the *Greenbaum* Cases 28 U.S.C. §1610(c) in New York shortly after *Peterson* filed its writ of attachment.

161.    Mr. Stroock then filed a motion to intervene in the *Peterson* cases in New York and to trump the *Peterson* priority under his belief that filing his 28 U.S.C. §1610(c) in New York gave the *Greenbaum* Clients priority over the *Peterson* Clients.

162.    In seeking to take over priority against the *Peterson* Clients, Mr. Rothenberg advanced an adversarial position in direct conflict with the *Peterson* Clients.

163.    Mr. Rothenberg never sought client consent, nor did he ever obtain client approval to take such an adversarial position against the *Peterson* Client.

164.    In fact, Mr. Rothenberg never even advised the *Peterson* Clients of any of his actions.

165.    Mr. Rothenberg also failed to ever inform Messrs. Fay and Perles that he was taking an adversarial role against the *Peterson* Clients.

166.    It was not until the Motion to Intervene was filed by Mr. Stroock that Messrs. Fay and Perles discovered this conflict of interest and then approached Mr. Rothenberg about his conduct.

167.    Upon information and belief to these Plaintiffs, Mr. Rothenberg testified that he had no prior knowledge of what Mr. Stroock had planned to do and did in fact do, and that once he spoke to Mr. Stroock after communications with Messrs. Fay and Perles he unilaterally decided to, in his words, "create a Chinese wall"[1] by voluntarily electing to cease communications with Fay & Perles and the *Peterson* Clients.

---

[1]    This will be referred to as an "ethical wall" as opposed to the antiquated terminology utilized by Mr. Rothenberg.

168.    Mr. Rothenberg never disclosed his conflict to the *Peterson* clients, nor did he ever seek or obtain client consent from the *Peterson* clients to continue representation of the *Peterson* clients or to create an ethical wall.

169.    Mr. Rothenberg did not create a proper ethical wall.

170.    Rather, Mr. Rothenberg attempted to create an ostrich hole in which to bury his head.

171.    Simply put, Mr. Rothenberg created a conflict of interest between himself and the *Peterson* clients, failed to disclose that conflict to the *Peterson clients*, failed to take steps to properly protect the *Peterson* clients' rights in spite of the conflict, and decided on his own accord that he would simply cut off all communications with the *Peterson* clients with the hopes that he would still be entitled to 1/9th of their gross recoveries in perpetuity.

172.    In the *Clearstream I* action, Bank Markazi filed a motion for summary judgment, which Fay & Perles were able to defeat. The matter then began to be tied up in the appellate litigation process.

173.    Fay & Perles recognized that if the assets were ever going to be recovered, this matter was going to find its way to the Supreme Court of the United States.

174.    Fay & Perles recognized that it was in the best interest for all parties to *Clearstream I* to undertake lobbying efforts to include language in the FSIA that would clarify the assets' status.

175.    Fay & Perles recognized that the lobbying efforts required massive coordination amongst the victims and the families of terrorist attacks.

176.    In order to be able to affirmatively lobby many U.S. Senators, it became clear that the language that would be inserted into the FSIA would have to result in equal relief to all victims of Iranian terrorist attacks and not merely the Fay & Perles clients.

177.    Fay & Perles saw no problem with this and presented the lobbying plan to their clients and the reason for agreeing to such a joint proposal.

178.    In February of 2012, The Fay & Perles *Peterson*[2] clients all agreed it was in their best interest to settle the priority battle by consenting in writing to sharing the *Clearstream I* assets with all victims of the October 23, 1983 Beirut Bombing terrorist actions, regardless if they were secured judgment creditors at the time.

179.    The *Peterson* clients understood that there were other family members and victims of the October 23, 1983 Beirut terrorist attacks whose cases were precluded from being added into the *Peterson* case, such as the Follow On Plaintiffs. Other such individuals also included family members of individuals who were plaintiffs to the *Peterson* case but had not been able to timely enter into the initial *Peterson* case.

180.    The *Peterson* clients also recognized that there would be future litigation on the priority interest in the *Clearstream I* assets in the same regard as there was to have been with the *Greenbaum* clients. To that end, the *Peterson* clients elected to settle any priority battle in *Clearstream I* with the other families of the October 23, 1983 Beirut terrorist attack who had obtained judgments. This settlement agreement has and is referred to as the "Marine Family Sharing Agreement."

181.    After the clients provided their consent, Fay & Perles entered into a "Cooperation Agreement" with the attorneys of other judgment creditors to work with an eye toward a unified front to resolve the *Clearstream I* asset distribution and to lobby in a coordinated effort to attain their goals.

---

[2]    *Peterson* clients" is used to represent all of the Fay & Perles clients as some of the original plaintiffs in *Peterson* had been dismissed and joined in the *Valore* case, and other clients such as the *Whorleys* had to file cases after the Court closed the window to be added to *Peterson*.

182.    Settlement discussions were then entered into with all judgment creditors in *Clearstream I*, and the judgment creditors all entered into a sharing agreement that has be referred to as the "87/13 Sharing Agreement."

183.    This 87/13 Sharing Agreement provided that the *Peterson* Clients received 87% of the *Clearstream I* recovery and the *Greenbaum* Clients and other judgment creditors would receive 13% of the *Clearstream I* recovery. In exchange for this division of funds, the *Peterson* and *Greenbaum* clients agreed not to challenge each other for priority status in protracted litigation and to do so in an effort to provide a united front on the lobbying efforts.

184.    It was understood by the *Peterson* clients that this 87% would be the value that would be shared across the board with all victims of the October 23, 1983 Beirut Bombing terrorist attack as contemplated from their consent in February of 2012 into the Marine Family Sharing Agreement.

185.    Because the asset was not categorized under the OFAC categories, a lobbying plan that was instituted was to have language inserted into the FSIA because this was the first time that a monetary asset was attached against a non-held government asset.

186.    With the Cooperation Agreement and the 87/13 Sharing Agreement in place, extensive lobbying efforts were put forth by Fay & Perles through the use of Andrew Cochran. Fay & Perles compensated Mr. Cochran through advances on client expenses. Neither Allen Rothenberg nor his firm paid out any such advanced payments.

187.    Fay & Perles continued to work with other lawyers and continued to work with the lobbyist to assure the Senators that all victims would be protected and would share in these funds.

188.    As a result of these efforts and the ability to demonstrate to the Senators that the parties were in agreement to share in the assets, 28 U.S.C. §8772(b)(2) was written into the FSIA.

The language added was as follows in bold: "The financial assets described in this section are the financial assets that are (2) identified in and the subject of proceedings in the United States District Court for the Southern District of New York in Peterson et al. v. Islamic Republic of Iran et al., Case No. 13 Civ. 9195 (LAP)."

189.     With that language now in place, the 2nd Circuit Court of Appeals had a solid basis to uphold the denial of Bank Markazi's Summary Judgment Motion, and, subsequently, The Supreme Court of the United States was also able to support its opinion to affirm the lower courts' rulings.

190.     Thus, had it not been for the parties' desire and agreement to enter into the Sharing Agreements, none of the parties would have been able to assure that any of the funds would have been recoverable.

191.     Kathleen N. Massey was appointed as a Special Master in the *Clearstream I* case pursuant to Rule 53(a) of the Federal Rules of Civil Procedure "to resolve certain disputes that have arisen in connection with the Peterson §468B Qualified Settlement Fund." *Peterson v. Islamic Republic of Iran*, 2017 WL 10299580, at 1, December 6, 2017 (S.D.N.Y.)

192.     Ms. Massey noted in her report that "Fay provided the Court with a proposed schedule of distributions. This schedule is identical to the Interim Payment schedule referred to above insofar as the numbers and shares are concerned. Based on the foregoing, it appears that Fay is requesting an order requiring the Trustee to distribute another $250 million of attorneys' fees in the same proportions the Trustee used when making the interim payment of fees. *While Fay's motion is not opposed by Rothenberg*, LaSpada, the Follow On Attorneys, HNK, the Damages Attorneys or the Enforcement Attorneys, Cook Glenn Delaney and Perles have all challenged Fay's

proposal for the final distribution of attorneys' fees." *Peterson v. Islamic Republic of Iran*, 2017 WL 10299580, at 18, December 6, 2017 (S.D.N.Y.) (emphasis added).

193.    In conclusion to her report, Ms. Massey stated that in "making the recommendations above with respect to the Retained Attorneys, Damages Attorneys, and Enforcement Attorneys, I note once more that all of these participants, with the exception of Perles, have generally agreed that Fay's Revised Schedule A correctly reflects the contingent-fee agreements and fee-sharing agreements that entitle them to fees." *Peterson v. Islamic Republic of Iran*, 2017 WL 10299580, at 38, December 6, 2017 (S.D.N.Y.)

194.    The Southern District of New York adopted the Special Masters report and the QSF Trustee obtained consent from all parties, including Mr. Rothenberg, and distributed the funds in accordance with "Fay's Revised Schedule A."

195.    In short, Mr. Rothenberg did not oppose the motion to distribute the funds filed by Fay and agreed to the Revised Schedule A, upon which he executed the consent provided by the QSF Trustee and accepted payment under the Revised Schedule A.

## SUBSEQUENT LITGATION OVER FEES

196.    As to be expected when large sums of money are obtained and disbursed, varying individuals raised disputes against one another.

197.    Upon information and belief to the Plaintiffs, Mr. Rothenberg and his firm instituted a private arbitration action against Fay Law Group, P.A., Thomas Fay, Esq., Perles Law Firm, P.C., and Steven Perles, Esq.

198.    Upon information and belief to these Plaintiffs, the arbitration agreement expressly states that the rights of the underlying clients in the *Peterson* case are not to be infringed upon in the arbitration and are not subject to the scope of arbitration.

199.    Upon information and belief, without being parties to the action and while having their rights expressly protected in the arbitration, the Rothenberg Defendants asserted relief in the arbitration for "entitlement to future attorneys' fees from under the Co-Counsel Agreement sufficient to remedy the dilution and other damages caused by Respondents' improper actions," and the Rothenberg Defendants have asserted that the "dilution" was created by Fay and Perles "agreeing on behalf of the Peterson Plaintiffs and the Follow-On Plaintiffs to a sharing arrangement that significantly increased their attorneys' fees at Rothenberg's expense."

200.    On or shortly after April 14, 2024, Plaintiffs received correspondence from their attorneys indicating that they had become aware that Mr. Rothenberg may have violated duties owed to them.

201.    The April 14, 2024 letter indicated that Mr. Rothenberg had alleged in the arbitration that he believed that the *Peterson* clients were coerced into entering into the Marine Family Sharing Agreement and that the *Peterson* clients had given away "his money."

202.    The April 14, 2024 letter also indicated that Mr. Rothenberg testified that it was his belief and position that the *Peterson* clients had no right to enter into the Marine Family Sharing Agreement in an effort to reduce his fee without his consent.

203.    This testimony and position of Mr. Rothenberg created a financial conflict of interest that had previously not been disclosed or known to the *Peterson* clients nor their attorneys.

204.    The April 14, 2024 letter informed the *Peterson* clients that "[i]t is now entirely up to you as to what, if anything, you want to do with the information. You have the absolute right to make changes to your legal team or to leave the team intact. Regardless of what you decide, the Rules of Professional Conduct will continue to require that your interests be represented with diligence and zeal. If you wish to contact Mr. Rothenberg about this allegations and claims, you

can do so at The Rothenberg Law Firm LLP, 1420 Walnut Street, Philadelphia, PA, 19102; (215) 330-6551; allan@injurylawyer.com[3]; www.InjuryLawyer.com."

205.    Subsequent to receiving this letter, the *Peterson* clients' attorneys held two zoom meetings to answer questions and reiterate the information contained in the April letter.

206.    As a result of the April 14, 2024 letter and the subsequent zoom meetings, the *Peterson* clients understood that the testimony given by Mr. Rothenberg was the first time that their attorneys had come to be aware of the financial conflict of interest that had evidently existed ever since his representation commenced, and that after consultation with ethics counsel their attorneys began taking the ethical steps to advise all of the *Peterson* clients of this newly discovered conflict.

207.    It was in fact the testimony of Mr. Rothenberg that first made the *Peterson* clients' counsel aware of Mr. Rothenberg's motives and financial conflict.

208.    The *Peterson* clients' counsel properly and ethically sent a copy of the April 14, 2024 letter to the Rothenberg Defendants.

209.    Upon information and belief to these Plaintiffs, The Rothenberg Defendants took issue with the letter and filed a motion in the arbitration, which resulted in the issuance of Order Number 7 on May 15, 2024.

210.    Upon information and belief Order Number 7, which was issued without Plaintiffs' knowledge, consent, input, or due process entitlements, resulted in the following rulings among others:

      a.    The granting of "an Order directing Perles Respondents and the Fay Respondents to facilitate, and not contest, Claimant's claim to direct payment of the Claimant's

---

[3]    It is recognized that the letter unintentionally misspelled "Allen" as "Allan."

pro rata share of legal fees in the 650 Fifth Avenue Action on account of the same individual Peterson Plaintiffs from whom the Claimant received legal fees in the Peterson et al v Islamic Republic of Iran, No. 10-4518 (SDNY), without those fees coming into the Respondents' possession;"

b. The granting of an order that the Respondents were required to provide the Rothenberg Defendants with a detailed written update on the status of future enforcement actions and any material developments of such actions;

c. The granting of an order that the Respondents provided the Rothenberg Defendants "with information regarding any communications or meetings the Respondents had with the Peterson Plaintiffs, who are the Claimant's clients, related to the [Rothenberg Defendants], the letter dated April 16, 2024, or the subject of this arbitration; and

d. The granting of a "detailed written statement of all communications with the Peterson Plaintiffs, who are the Claimant's clients, regarding the Claimant, the April 16, 2024, letter, or the subject of this arbitration, including the Zoom sessions, and . . . shall continue to provide the Claimant with the same detailed information for any past, present and future communications with the Peterson Plaintiffs who are the Claimant's clients."

211. On May 28, 2024, Mr. Rothenberg sent a letter to the *Peterson* clients in which he stated that he "was shocked by the letter, which Fay & Perles did not preview with me, and am working on detailed response. I think that you will be surprised by what I have to share and I ask that you reserve judgment until receiving my response, which may or may not come before the arbitration is resolved."

212.   This May 28, 2024 letter of Mr. Rothenberg was not sent to Plaintiffs' counsel.

213.   To date, no "detailed response" has ever been sent to Plaintiffs.

214.   Several months later in late 2024, Plaintiffs' counsel learned of the potential of resolving another collection action as well as obtaining a nearly imminent disbursement from the United States Victims of State Sponsored Terrorism ("USVSST") Fund.

215.   Plaintiffs' counsel contacted ethics counsel to ensure that she was both properly informing the clients while also complying with the arbitrator's order.

216.   Plaintiffs then received confidential attorney-client communications relating to the resolution of a subsequent collection action.

217.   During that communication, Plaintiffs were asked to confirm who needed to be included on the distribution form in order to provide a detailed accounting of all funds.

218.   Plaintiffs either informed their counsel of their prior termination of Mr. Rothenberg or determined at that time to elect to exercise their rights to determine who would be their attorneys and elected to terminate Mr. Rothenberg. Some Plaintiffs advised their counsel at that time that they had already terminated Mr. Rothenberg and his firm.

219.   Some of the Plaintiffs who had not yet sent termination letters to Mr. Rothenberg and his firm inquired as to how to terminate Mr. Rothenberg and were informed that they simply needed to send him a termination letter.

220.   Plaintiffs subsequently sent Mr. Rothenberg termination letters.

221.   All named Plaintiffs to this lawsuit have expressly issued termination letters to the Rothenberg Defendants.

222.    Upon information and belief, all but 3 of the over 500 *Peterson* clients whom Mr. Rothenberg had at one point "represented" have terminated Mr. Rothenberg and his firm from further representation.

223.    Upon information and belief, the vast majority of those termination letters were only sent to Mr. Rothenberg and were not sent to Fay and/or Perles.

224.    As Fay began working through the USVSST distribution forms related to itemization of the fees and to identify funds that needed to be escrowed pending any fee disputes, Fay requested of those clients that had terminated Mr. Rothenberg for copies of those termination letters.

225.    Upon information and belief, many of the clients that sent termination letters to Mr. Rothenberg did not make copies of the letters or scan the letter for easy access.

226.    Upon information and belief, Mr. Rothenberg then sought sanctions against Plaintiffs' attorneys for what he claimed was a conspiracy to have him terminated and a violation of Order Number 7.

227.    Upon information and belief, the arbitrator issued sanctions that have given Mr. Rothenberg the ability to take direct possession of pro rata attorneys' fees under the initial retainer without Plaintiffs' consent and without allowing for proper adjudication of any claim dispute between Plaintiffs and Mr. Rothenberg and without holding any evidentiary hearing to determine what the motive was for Plaintiffs' to terminate Mr. Rothenberg.

228.    In issuing the sanctions against Plaintiffs' counsel in the arbitration, the arbitrator stated that he was making an adverse inference "that the Respondents are cloaking themselves in the Rules of Professional Conduct to steal the Claimant's fees derived from the plaintiffs he represents in the <u>Peterson</u> Action."

229.    Upon information and belief, counsel for the Fay Respondents in the arbitration has executed and provided an affidavit in which she has advised the arbitrator that under the Retainer Agreement the Fay Respondents have no claim or interest in the 1/3 apportionment of attorneys' fees that the Rothenberg Defendants may claim an interest.

230.    Said affidavit makes clear that the Fay Respondents to the arbitration have advanced the position that termination of Mr. Rothenberg by the Plaintiffs creates the potential of a disputed claim to 1/3 of the attorneys' fees that must be placed into an escrow account if the claim is asserted until the claim is adjudicated and/or resolved. To the extent that any resolution would result in the Rothenberg Defendants not obtaining 100% of the disputed fee, any such balance would belong to the clients and not Fay and/or Perles.

231.    Upon information and belief, counsel for the Fay Respondents in the arbitration has taken various steps to inform the arbitrator as well as Mr. Rothenberg and Mr. Buckley of the infringement upon the Plaintiffs' rights and interests and the ethical requirements that the Fay Respondents to the arbitration are under in representing these Plaintiffs and all of her clients.

232.    Mr. Buckley has utilized the sanctions award to reach out to the third-party administer of the funds subject to the post-*Clearstream I* collection actions and demanded that the administer of the funds direct his pro rata share of *all the clients* from whom Mr. Rothenberg had received distribution from in *Clearstream I* directly to him without regard for those individual clients who have terminated Mr. Rothenberg and his firm.

233.    Counsel for the Fay Respondents in the arbitration, as well as the administrator of the funds, have inquired from Mr. Buckley which clients Mr. Rothenberg claims to still represent.

234.    Mr. Buckley has refused to provide that information to Counsel for the Fay Respondents or the third-party administrator.

235.    Mr. Buckley has specifically informed the third-party administrator that he does not represent any of the clients but is instead seeking "to protect Allen Rothenberg's rights both to his share of the legal fees to be paid from the distribution and to enforce the sanctions imposed by the Arbitrator in the Interim Award (neither of which have any impact on the claimants' recoveries)..."

236.    Upon information and belief to these Plaintiffs, Mr. Buckley has specifically informed counsel for the Fay Respondents in the arbitration that there is no obligation for him or his client to advise Fay and/or Perles as to which clients have terminated Mr. Rothenberg.

237.    Upon information and belief to these Plaintiffs, having been rebuked by Mr. Buckley to gain access to the termination letters and in order to abide by the Rules of Professional Conduct and the arbitrator's order, counsel for the Fay Respondents in conjunction with an ethics attorney drafted a form to be sent to all the *Peterson* clients that asked them to acknowledge: 1) If they have or have not terminated Mr. Rothenberg; and 2) If they do or do not consent to Mr. Rothenberg obtaining fees from the distribution.

238.    Upon information and belief to these Plaintiffs, prior to sending that form out to the clients, counsel for the Fay Respondents in the arbitration circulated it to the arbitrator and all counsel of record for comment on the language in order to abide by Order Number 7.

239.    Upon information and belief to these Plaintiffs, Mr. Buckley has objected to the form being sent out on the basis that he believes said form would be an attempt to "contest" that Mr. Rothenberg has a claim to the distribution funds.

240.    Upon information and belief to these Plaintiffs, in response to Mr. Buckley's claim to both the third-party administrator and the arbitrator, counsel for the Fay Respondents had to explain to Mr. Buckley that when a fee dispute arises, the disputed funds have to be placed in escrow until the dispute is resolved with the client.

241.    Upon information and belief to these Plaintiffs, Mr. Buckley has been informed on several occasions that if there is a fee dispute over those funds then any attempt to utilize the arbitrator's order as a means to obtain funds of another to which his client does not have a right is improper, illegal, and raises ethical considerations.

242.    Upon information and belief to these Plaintiffs, counsel for the Fay Respondents in the arbitration has even directed Mr. Buckley to *In Re: Kennedy*, 281 A.3d 36 (D.C. 2022) that specifically states that an attorney "has no right to help themselves to the settlement funds without authorization from the clients to take an agreed upon amount of the funds as attorney's fees; until such an agreement [is] reached, the entire settlement award [is the] clients."

243.    Upon information and belief, Mr. Buckley has informed counsel for the Fay Respondents in the arbitration that the rights of the Plaintiffs do not matter because he has an arbitrators' order that allows him to seek the funds as a sanction and to collect them directly from the third party administrator.

244.    Upon information and belief to these Plaintiffs, again, counsel for the Fay Respondents in the arbitration has advised Mr. Buckley that such conduct amounts to an attempt to unlawfully take money from a third party that he and his client know he has no right to take.

## CLASS ACTION ALLEGATIONS

245.    Pursuant to Rule 23 – specifically Rule 23(b)(1), 23(b)(2), and 23(b)(3) – of the Federal Rules of Civil Procedure, Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated.

246.    Plaintiffs seek to represent the following class and subclasses:

THE CLASS

All persons who have received a financial recovery from *Peterson v. Islamic Republic of Iran*, 01-CV-294 RCL, as well as *Bonk v. Islamic Republic of Iran, et al.*, 08-CV-1273, which was consolidated into *Valore v. Islamic Republic of Iran*,

03-CV-1959, and who entered into a Retainer Agreement with Fay, Perles, and Rothenberg and who now have money held in escrow related to that recovery.

THE SUBCLASSES

1.    All persons who never had entered into an attorney client relationship with Rothenberg.
2.    All persons who entered into an attorney client relationship with Rothenberg but terminated his representation of them.
3.    All personal who entered into an attorney client relationship with Rothenberg but who Rothenberg created a conflict with despite duties owed.

247.    Excluded from the class are Defendants; officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest; the affiliates, legal representatives, attorneys, heirs, and assigns of the Defendants.

248.    Excluded from the Classes are (1) any judge presiding over this action and members of their families; (ii) Defendants, Defendants' subsidiaries, parents successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former employees, officers, and directors; (iii) persons who properly execute and file a timely request for exclusion from the Classes; and (iv) the legal representatives, successors, or assigns of any such excluded persons, as well as any individual who contributed to the unauthorized access of the data stored by Defendants.

249.    Plaintiffs meet the requirements of Federal Rules of Civil Procedures 23(a) because the members of the Class are so numerous that the joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiff at this time, based on information and belief, it is excess of three hundred members.

250.    Plaintiffs meet the requirements of Federal Rules of Civil Procedures 23(a) because there is a well-defined community of interest among the members of the Class, common questions

of law and fact predominate, the claims are typical of the members of the Class, and the Plaintiffs can fairly and adequately represent the interests of the Class.

251.    The action satisfies the requirement of Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

252.    Plaintiffs and members of The Class also seek declaratory relief because Defendants have acted and failed to act on grounds that affect The Class as a whole. Therefore, the action satisfies the requirements of Rule 23(b)(2).

253.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3) because it involves questions of law and fact common to the member of the Class that predominate or any questions affecting only individual members, including, but not limited to:

    a.    Whether Defendants are entitled to an attorney-fee;

    b.    Whether Defendants forfeited the right to a fee by engaging in a conflict of interest; and,

    c.    Whether the monies held in escrow should be disbursed to members of the class, rather than to Defendants.

254.    The Plaintiffs claims are typical of those of other Class members because Plaintiffs' claims to the purported fee, like that of every other class member, depends on whether an attorney-client relationship existed at the time of recovery.

41

255.    Plaintiffs will fairly and adequately represent the interests of The Class and the respective subclasses.

256.    The prosecution of separate actions by individual members of the Class or separate actions of each subclass would create a risk of inconsistent or varying adjudications with respect to individual members of The Class, which would establish incompatible standards of conduct for the Defendants and would lead to repetitive adjudication of common questions of law and fact. The Class is in excess of 1 million individuals, and accordingly, class treatment is superior to any other method for adjudicating the controversy. The Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action under Rule 23(b)(3).

257.    For all of the foregoing reasons, certification is proper under Rule 23(b)(1), 23(b)(2) and 23(b)(3).

258.    Plaintiffs reserve the right to revise Class definitions and questions based upon facts learned in discovery.

**<u>DECLARATORY RELIEF COUNT I</u>**

259.    Plaintiffs incorporate each and every preceding paragraph herein by reference.

260.    The right to select and terminate counsel is a right afforded to the clients and not subject to the underlying arbitration between the Rothenberg Claimants and the Fay & Perles Respondents.

261.    "The client has an absolute right to discharge an attorney at any time. Moreover, a client need not demonstrate cause prior to discharging an attorney. The reasons for the discharge, however, may affect the fees owed to the attorney." *In re Waller*, 524 A.2d 748, 753 (D.C. 1987).

262.    Defendants in this action refuse to acknowledge that the Plaintiffs and numerous other *Peterson* clients have terminated Mr. Rothenberg and his firm from representation.

263.    Defendants have asserted that the clients who have sent termination letters are merely "purportedly terminated clients."

264.    Defendants' refusal to acknowledge and accept the fact that these Plaintiffs and others have terminated the Rothenberg Defendants has caused damage to the Plaintiffs' attorney-client relationships and has been utilized to gain access to privileged and confidential attorney-client communications.

265.    Plaintiffs desire declaratory relief by this Court to compel Defendants to produce all termination letters and correspondence that they have received from *Peterson* clients and to provide an itemized list of which clients have terminated them either by written correspondence or verbal intent and which clients they believe they still represent.

266.    Plaintiffs desire declaratory relief by this Court to then issue as a matter of law that Mr. Rothenberg and his law firm have been terminated by all of the named Plaintiffs to this Petition as well as all clients that are to be identified once Defendants have complied with the preceding paragraph's relief sought, non pro tunc.

## DECLARATORY RELIEF COUNT II

267.    Plaintiffs incorporate each and every preceding paragraph herein by reference.

268.    Upon filing the Motion to Intervene by Mr. Stroock on behalf of Mr. Rothenberg in the representation of the *Greenbaum* Clients, Mr. Rothenberg took an adversarial position against the *Peterson* clients.

269.    Pursuant to Rule 1.7(a) of the Rules of Professional Conduct, "[a] lawyer shall not advance two or more adverse positions in the same matter."

270. Pursuant to Rule 1.7(b) of the Rules of Professional Conduct:

Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:

(1) That matter involves a specific party or parties and a position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter even thought that client is unrepresented or represented by a different lawyer;

(2) Such representation will be or is likely to be adversely affected by such representation;

(3) Representation of another client will be or is likely to be adversely affected by such representation;

(4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests.

271. Pursuant to Rule 1.7(c) of the Rules of Professional Conduct:

A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if

(1) Each potentially affected client provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation; and

(2) The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client.

272. Mr. Rothenberg's representation of the *Peterson* clients and *Greenbaum* clients was in violation of Rule 1.7(b).

273. Mr. Rothenberg never obtained informed consent from Plaintiffs or any *Peterson* client with respect to the conflict that existed due to his alleged dual representation of both the *Peterson* clients as well as the *Greenbaum* clients.

274.    Mr. Rothenberg never believed that he was able to provide competent and diligent representation to the Plaintiffs or any of the *Peterson* clients because, by his own admission, he created an ethical wall between himself and the *Peterson* clients and shut off all communications with the *Peterson* clients.

275.    Plaintiffs desire declaratory relief in the form of a finding of law that Mr. Rothenberg and his law firm took an adversarial positions to the *Peterson* clients that precluded them from any continued representation of those clients at the time that the Motion to Intervene was filed in the *Clearstream I* action and that such an adversarial position to the *Peterson* clients foreclosed any right to any attorneys' fees from any gross monies recovered by the *Peterson* clients in the past, present, or future, non pro tunc.

## DECLARATORY RELIEF COUNT III

276.    Plaintiffs incorporate each and every preceding paragraph herein by reference.

277.    Upon testifying in the arbitration hearing that the clients had no right to enter into the Marine Family Sharing Agreement and to diminish his own personal recovery of attorneys' fees, Defendant Allen Rothenberg admitted under oath that he believed that his own personal financial interest was in direct conflict with the representation of the *Peterson* clients.

278.    The presence of a financial conflict of interest between an attorney and client creates a conflict of interest pursuant to Rule 1.7 of the Rules of Professional Conduct.

279.    Once Mr. Rothenberg acknowledged under oath that he believed that his financial interest precluded the *Peterson* clients from entering into the Marine Family Sharing Agreement, he conceded that he had a conflict of interest under Rule 1.7(a) and Rule 1.7(b)(4) of the Rules of Professional Conduct.

280.    Mr. Rothenberg never

a. previously fully disclosed the existence and nature of the possible conflict and the possible adverse consequences of such representation to the *Peterson* clients;

b. never sought to obtain informed consent from the *Peterson* clients to continue representation;

c. never obtained informed consent from the *Peterson* clients to continue representation; and

d. never reasonably believed that he could provide competent and diligent representation to each of the *Peterson* clients as he even testified that he had ceased communications with them to avoid a conflict.

281. Having created a financial conflict of interest that he intentionally failed to fully disclose to the clients, failed to obtain informed consent from the clients, and recognized that he could not provide them competent and diligent representation, Mr. Rothenberg was conflicted out of continuing to represent any of the *Peterson* clients.

282. To this day, Mr. Rothenberg has not obtained a waiver of his conflict from the *Peterson* clients.

283. To that end, Plaintiffs desire declaratory relief in the form of a finding of law that Mr. Rothenberg and his law firm have had a financial conflict of interest since the moment Mr. Rothenberg took the position that the *Peterson* clients' interest in entering into the Marine Family Sharing Agreement was beneath his interest in receiving attorneys' fees that he believed he was entitled to recovery.

284. Plaintiffs further desire declaratory relief in the form of a finding of law that Mr. Rothenberg and his law firm were therefore conflicted out of representing the *Peterson* clients from the moment that the financial conflict existed and continue to be until the present day and are not entitled to recover any attorneys' fees in relationship to the *Peterson* clients' collections non pro tunc.

## DECLARATORY RELIEF COUNT IV

285.    Plaintiffs incorporate each and every preceding paragraph herein by reference.

286.    In accordance with the Special Master's Report as adopted by the S.D.N.Y. in *Clearstream I*, Mr. Rothenberg did not oppose the Fay Motion to require the Trustee of the QSF to distribute another $250 million in the same proportions the Trustee used when making the interim payment on the fees.

287.    In accordance with the Special Master's Report as adopted by the S.D.N.Y. in *Clearstream I,* Mr. Rothenberg "generally agreed that Fay's Revised Schedule A correctly reflect[ed] the contingent-fee agreements and fee-sharing agreements that entitled [him] to fees."

288.    In accepting the fees as set forth under the Fay's Revised Schedule A upon distribution by the Trustee of the QSF, Mr. Rothenberg extinguished any claim to further recoveries of attorneys' fees related to *Clearstream I.*

289.    Plaintiffs, thus, desire declaratory relief against Mr. Rothenberg and his firm to find as a matter of law that upon accepting the fees set forth under the Fay's Revised Schedule A after consenting to the Trustee's term sheet and receiving the funds as he generally agreed, Mr. Rothenberg and his firm were made whole for any potential attorneys' fees they were potentially entitled to under the retainer agreements with the *Peterson* clients for *Clearstream I.*

## DECLARATORY RELIEF COUNT V

290.    Plaintiffs incorporate each and every preceding paragraph herein by reference.

291.    Plaintiffs to this case as well as other individuals have terminated Mr. Rothenberg and his firm from representation related to the *Peterson* action.

292.    Immediately upon termination, it was understood that Mr. Rothenberg, by virtue of the pendency of the arbitration action, was asserting a claim against future recoveries to the Plaintiffs. Such a claim created what is referred to hereinafter as the "fee dispute."

293.    The creation of a fee dispute requires Fay & Perles, as the current attorneys for the clients who have terminated the Rothenberg Defendants, to recognize the Rothenberg Defendants as third-parties with a claim to a percentage of the gross recovery obtained by the Plaintiffs and those who have terminated the Rothenberg Defendants.

294.    Fay & Perles have recognized that such fee disputes exist against the *Peterson* clients who have terminated the Rothenberg Defendants.

295.    When a client terminates an attorney, the value of recovery for the attorney is generally limited to *quantum meruit* unless the attorney has substantially performed under a contingency fee agreement. *See Kaushiva v. Hutter*, 454 A.2d 1373 (1983).

296.    When an attorney has only performed inconsequential services of little benefit to the client before discharge, *quantum meruit* is the appropriate measure of recovery in a fee dispute. *See In re Waller*, 524 A.2d 748 (1987).

297.    Plaintiffs, thus, desire declaratory relief against Mr. Rothenberg and his firm to find as a matter of law that any potential recovery for any claim to disputed attorneys' fees that Mr. Rothenberg and his firm believe that they are entitled to recovery must be sought through a fee dispute against the former client that terminated them with a measure of damages to be based solely on *quantum meruit* relief from the allocated expected fee percentage of the gross recovery established in the original retainers and to be held in escrow.

48

## DECLARATORY RELIEF COUNT VI

298.    Plaintiffs incorporate each and every preceding paragraph herein by reference.

299.    Pursuant to Rule 1.2(a) of the Rules of Professional Conduct and D.C. Ethics Opinion 355, "a lawyer shall abide by a client's decision concerning the objectives of representation . . . [and] has a duty to abide by his client's decision whether to accept an offer of settlement."

300.    The decision of the *Peterson* clients to enter into the Marine Family Sharing Agreement was a settlement agreement.

301.    The decision of the *Peterson* clients to enter into the 87/13 Fee Sharing Agreement was a settlement agreement.

302.    Assuming *arguendo,* and alleging such relief as an alternative to the prior relief sought, that Mr. Rothenberg and his firm represented the *Peterson* clients at the time that the two settlements were entered into, Mr. Rothenberg and his firm were and are under a duty to abide by those clients' decisions to have entered into such settlement agreements.

303.    Plaintiffs, thus, desire declaratory relief against Mr. Rothenberg and his firm to find as a matter of law that in settling their claims through the Marine Family Settlement Agreement, the *Peterson* gross recovery in *Clearstream I* from which attorneys' fees were to be calculated was the dollar figure established in *Clearstream I*, which the Rothenberg Defendants did not object to and accepted in full satisfaction of their claim to attorneys' fees in *Clearstream I.*

304.    Further, Plaintiffs, thus, desire declaratory relief against Mr. Rothenberg and his firm to find as a matter of law that Mr. Rothenberg and his firm had and have no right to attempt to calculate the attorneys' fees based off of the amount that the *Peterson* clients would have recovered had they not elected to settle the dispute with those Marines and family members as the

attorney-client privilege placed a continuing duty upon the Rothenberg Defendants "to abide by [their] client's decision whether to accept an offer of settlement."

## PRAYER FOR RELIEF

*WHEREFORE* in summation to the direct relief sought under each count and incorporated herein, Plaintiffs seek the following relief:

a. A declaration, order, and judgment holding that The Rothenberg Defendants have been terminated by all Plaintiffs named in this Petition as well as all prior clients who have expressed their desire to terminate The Rothenberg Defendants that are currently unknown to these named Plaintiffs, *non pro tunc*;

b. A declaration, order, and judgment holding that Mr. Rothenberg and his law firm took an adversarial positions to the *Peterson* clients that precluded them from any continued representation of those clients at the time that the Motion to Intervene was filed in the *Clearstream I* action and that such an adversarial position to the *Peterson* clients foreclosed any right to any attorneys' fees from any gross monies recovered by the *Peterson* clients in the past, present, or future, non pro tunc;

c. A declaration, order, and judgment holding that Mr. Rothenberg and his law firm had and continue to have a financial conflict of interest with the *Peterson* clients that has not been waived and, therefore, upon execution of the Marine Family Sharing Agreement Mr. Rothenberg and his law firm were and are precluded from obtaining any attorneys' fees from the *Peterson* clients collections efforts, non pro tunc;

d. A declaration, order, and judgment holding that upon accepting the fees set forth under the Fay's Revised Schedule A after consenting to the Trustee's term sheet and

receiving the funds as he generally agreed, Mr. Rothenberg and his firm were made whole for any potential attorneys' fees they were entitled to under the retainer agreements with the *Peterson* clients, non pro tunc;

e.  A declaration, order, and judgment holding that any potential recovery for any claim to disputed attorneys' fees that Mr. Rothenberg and his firm believe that they are entitled to recovery must be sought through a fee dispute against the former client that terminated them with a measure of damages to be based solely on *quantum meruit* relief from the allocated expected fee percentage of the gross recovery established in the original retainers and to be held in escrow by Fay & Perles, non pro tunc;

f.  A declaration, order, and judgment holding that to the extent that Mr. Rothenberg and his firm represented the *Peterson* clients at the time that the two settlements were entered into, Mr. Rothenberg and his firm were and are under a duty to abide by those client's decisions to have entered into such settlements agreements and cannot take or assert an adversarial position to their determination to enter into any such settlement agreements, in the past, present, or in the future, non pro tunc;

g.  A declaration, order, and judgment holding that in settling their claims through the Marine Family Settlement Agreement, the *Peterson* gross recovery in *Clearstream I* from which attorneys' fees were to be calculated from was the dollar figure established in *Clearstream I*, which the Rothenberg Defendants did not object to and accepted in full satisfaction of their claim to attorneys' fees for the *Clearstream I* distribution, non pro tunc;

h.  A declaration, order, and judgment holding that any orders or interim or potential

final awards that affect the distribution of any attorneys' fees that have not been

consented to by the Plaintiffs and clients to whom the recoveries have been made

are found to be now and in the future unenforceable and non pro tunc.

Plaintiffs seek any and all other relief this Court deems appropriate.

Respectfully Submitted:

Respectfully submitted,

NACE LAW GROUP

Christopher T. Nace, Esq.
Bar No. 977865
1025 Thomas Jefferson St., NW Suite 810
Washington, DC 20007
202-463-1999 (Tel.)
ctnace@nacelawgroup.com
*Counsel for Plaintiffs*

***Plaintiffs request trial by jury on any and all counts
to which a jury trial is available.***

`